821 F.2d 810
 261 U.S.App.D.C. 322, 56 USLW 2030, Fed.
Sec. L. Rep. P 93,294
 SECURITIES INDUSTRY ASSOCIATION, Petitioner,
v.
BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, et al., Respondents,
National Westminster Bank PLC and NatWest Holdings Inc., Intervenor.
 No. 86-1412.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 13, 1987.
Decided July 7, 1987.
 
 James B. Weidner, with whom David A. Schulz and William J. Fitzpatrick, New York City, were on the brief for petitioner.
 Richard M. Ashton, Atty., Bd. of Governors of the Federal Reserve System, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice and Kevin J. Handly, Atty., Bd. of Governors of the Federal Reserve System, Washington, D.C., were on the brief for respondents.
 
 
 1
 Richard F. Ziegler, New York City, for intervenor.
 
 
 2
 John J. Gill, III and Michael F. Crotty, Washington, D.C., were on the brief for amicus curiae, American Bankers Ass'n, urging affirmance of the Board of Governors' decision.
 
 
 3
 J. Michael Luttig, McLean, Va., was on the brief for amicus curiae, New York Clearing House Ass'n, urging affirmance of the Bd. of Governors' decision.
 
 
 4
 Before BORK and SILBERMAN, Circuit Judges, and MARKEY,* Chief Judge.
 
 
 5
 Opinion for the Court filed by Circuit Judge BORK.
 
 BORK, Circuit Judge:
 
 6
 Section 20 of the Glass-Steagall Act[1] prohibits the affiliation of member banks of the Federal Reserve System with corporations "engaged principally in the issue, flotation, underwriting, public sale, or distribution" of securities. 12 U.S.C. Sec. 377 (1982). The issue here is whether the Board of Governors of the Federal Reserve System reasonably concluded that the combined provision of securities brokerage services and investment advice by a member bank's affiliate does not implicate section 20's prohibition of the "public sale" of securities. We find that the Board's decision is a reasonable interpretation of the language and legislative history of the Act and is consistent with prior precedent. We therefore deny the petition for review.
 
 I.
 
 7
 In August 1985, National Westminster Bank PLC and its subsidiary NatWest Holdings, Inc. (collectively "NatWest") submitted an application to the Board pursuant to section 4(c)(8) of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Sec. 1843(c)(8) (1982),[2] for permission to provide investment advice and securities brokerage services to institutional customers through a newly formed subsidiary, County Services Corporation ("CSC").[3]
 
 
 8
 As proposed by NatWest, CSC's brokerage services would be restricted to buying and selling securities solely as agent for the account of customers. CSC would execute transactions only at the request of its customers and would not exercise any discretion with respect to a customer's account. Joint Appendix ("J.A.") at 63. CSC would not act as principal or as underwriter and would not bear any financial risk with respect to any security it brokers or recommends. Id. at 102. Generally, CSC would receive all of its compensation, including that for investment advice, in the fees for securities transactions it executes for customers. Id. at 10-11. CSC would charge separate fees for investment advice and brokerage services upon request of a customer. Id. at 11.
 
 
 9
 NatWest's application also provided that CSC would hold itself out as a corporate entity separate and distinct from NatWest and would have its own assets, liabilities, books and records. J.A. at 12. NatWest and CSC would not share customer or depositor lists or confidential information. Id.[4]
 
 
 10
 In an order dated June 13, 1986, the Board approved the application. National Westminster Bank PLC, 72 Fed.Res.Bull. 584 (1986). The Board determined first that CSC's proposed activities are closely related to banking and that the proposal may reasonably be expected to result in public benefits that outweigh possible adverse effects so that the activities are a "proper incident" to banking within the meaning of section 4(c)(8) of the Bank Holding Company Act. Id. at 584-91. The Board then concluded that NatWest's acquisition of CSC would not violate the Glass-Steagall Act because the combination of investment advice and execution services does "not constitute a 'public sale' of securities for purposes of sections 20 and 32 of the ... Act." Id. at 592.[5] The Securities Industry Association ("SIA"), a trade association of underwriters, brokers and securities dealers, then petitioned for review of the Board's decision. SIA challenges only the Board's determination that provision of the proposed services would not violate section 20 of the Glass-Steagall Act.
 
 II.
 
 11
 Because the Board engaged in a comprehensive review of the language and legislative history of section 20, and provided a detailed and reasoned explanation for its conclusion that the proposed activities do not fall within that provision's prohibitions, its decision is entitled to "substantial deference." Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 807 F.2d 1052, 1056 (D.C.Cir.1986) ("Bankers Trust II "), cert. denied, --- U.S. ----, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987); see Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 468 U.S. 207, 217, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1984); Board of Governors of the Fed. Reserve Sys. v. Investment Co. Inst., 450 U.S. 46, 56, 101 S.Ct. 973, 981, 67 L.Ed.2d 36 (1981). Since Congress has not addressed the issue of whether the combined provision of brokerage services and investment advice is a "public sale" within the meaning of section 20, we must uphold the Board's interpretation if it is a reasonable construction of the statute. INS v. Cardoza-Fonseca, --- U.S. ----, 107 S.Ct. 1207, 1221-22, 94 L.Ed.2d 434 (1987); Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984); Investment Co. Inst. v. Conover, 790 F.2d 925, 932 (D.C.Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 421-22, 93 L.Ed.2d 372 (1986).
 
 
 12
 In determining the meaning of section 20 of the Act, which prohibits member bank affiliation with any corporation "engaged principally in the issue, flotation, underwriting, public sale, or distribution" of securities, we are not without guidance. In Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 468 U.S. 207, 104 S.Ct. 3003, 82 L.Ed.2d 158 (1984) ("Schwab "), the Supreme Court addressed the issue of whether the provision of "discount" brokerage services--the provision of execution services without investment advice--violated section 20 and concluded that the term "public sale" must be read in conjunction with the terms surrounding it. The Court then held that discount brokerage did not fall within the term "public sale":
 
 
 13
 None of the[ ] terms [in section 20] has any relevance to the brokerage business at issue in this case. Schwab does not engage in issuing or floating the sale of securities, and the terms "underwriting" and "distribution" traditionally apply to a function distinctly different from that of a securities broker. An underwriter normally acts as principal whereas a broker executes orders for the purchase or sale of securities solely as agent.
 
 
 14
 468 U.S. at 217-18, 104 S.Ct. at 3009 (footnotes omitted). The Court thus upheld the Board's determination that "the business of purchasing or selling securities upon the unsolicited order of, and as agent for, a particular customer does not constitute the 'public sale' of securities for purposes of section 20," id. at 221, 104 S.Ct. at 3011 (internal quotation omitted). The Court did not reach the question presented in this petition of whether the combined provision of brokerage services and investment advice is the "public sale" of securities.
 
 
 15
 The Court has, however, addressed the question of whether the independent provision of investment advice violates the prohibitions in the Act. In Board of Governors of the Fed. Reserve Sys. v. Investment Co. Inst., 450 U.S. 46, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981) ("ICI "), the Court held that "[t]he management of a customer's investment portfolio--even when the manager has the power to sell securities owned by the customer--is not the kind of selling activity Congress contemplated when it enacted Sec. 21," id. at 63, 101 S.Ct. at 985, because when the advisor acts in this situation it is "for the account of its customer--not for its own account." Id. at 66 n. 37, 101 S.Ct. at 987 n. 37.[6]
 
 
 16
 Thus, because the Court has upheld against Glass-Steagall challenges the independent provision of CSC's proposed services, the only issue presented here is whether the combined provision of investment advice and securities brokerage services transforms these separately permissible activities into a "public sale" within the meaning of section 20. The Board concluded that they did not because
 
 
 17
 [i]n providing investment advice in connection with the execution of securities transactions, CSC would act solely as agent for its customers and would not act as a principal (i.e., with its own funds) in buying and selling securities. CSC would not, like many securities firms, make a market in securities with its own funds. Nor would CSC offer securities to the public as agent for the issuer of securities.
 
 
 18
 72 Fed.Res.Bull. at 592 (footnote omitted). We believe that this is a reasonable interpretation of the term "public sale" as defined by the Court in Schwab. The addition of investment advice to brokerage activities does not implicate any of the activities which the Schwab Court described as traditionally associated with underwriting.
 
 
 19
 As was the case in Schwab, CSC will have no relationship with the issuer other than that related to the execution of transactions as agent for the customer. CSC will not purchase the issuer's securities for sale to the public, see Schwab, 468 U.S. at 217-18 n. 17, 104 S.Ct. at 3009 n. 17, but instead will "execute[ ] orders for the purchase or sale of securities solely as agent." See id. at 218, 104 S.Ct. at 3009. Nor will CSC act as agent for the issuer as a "best efforts" underwriter. See id. at 217-18 n. 17, 104 S.Ct. at 3009 n. 17.[7] The proposed activities in this case, for purposes of determining the scope of the term "public sale," are simply indistinguishable from the activities described in Schwab.
 
 
 20
 The sole distinction cited by SIA is that CSC will also provide investment advice. We cannot understand, however, why this should transform the proposed activities into the public sale of securities. See Bankers Trust II, 807 F.2d at 1061 (rejecting contention that rendering financial advice itself removes a bank's placement activities from the category of transactions made "solely upon the order of a customer"). While it is true that the provision of investment advice may be another attribute common to underwriters, this does not necessarily mean that it transforms the activities into those of underwriters. The critical attributes of underwriters, as defined in Schwab, are that they either purchase securities from the issuer or act as the agent of the issuer. 468 U.S. at 217-18, 104 S.Ct. at 3009. The provision of investment advice does not alter the fact that CSC will not engage in either of these activities.
 
 
 21
 This interpretation of the Act is also consistent with the Court's decision in ICI. The Court there specifically held that the provision of investment advice by a nonbank subsidiary, even when coupled with the power to sell the securities owned by the customer, was not "selling" within the meaning of section 21. 450 U.S. at 63, 101 S.Ct. at 985. The Court based its decision in part on the finding that Congress could not have intended in section 21 to require banks to abandon the traditional practice of managing investment accounts in a fiduciary capacity or as an agent for an individual. Id. The Court described these practices earlier in the opinion as follows:
 
 
 22
 The services of an investment adviser are not significantly different from the traditional fiduciary functions of banks. The principal activity of an investment adviser is to manage the investment portfolio of its advisee--to invest and reinvest the funds of the client. Banks have engaged in that sort of activity for decades. As executor, trustee, or managing agent of funds committed to its custody, a bank regularly buys and sells securities for its customers. Bank trust departments manage employee benefits trusts, institutional and corporate agency accounts, and personal trust and agency accounts.
 
 
 23
 Id. at 55, 101 S.Ct. at 981; see also Schwab, 468 U.S. at 212 n. 8, 104 S.Ct. at 3006 n. 8 ("banks often execute purchase and sell orders for securities that are not traded on an exchange without an intervening broker. To this extent they perform the same services as a retail broker"). The activities described by the Court in ICI are similar to those proposed by CSC. In each case the bank, or bank affiliate, offers investment advice and provides for the execution of the purchase or sale of securities for the customer. One difference between the services proposed here and those addressed by the Court in ICI is that the bank in ICI also had discretionary authority with respect to the customer's account and CSC will be permitted to execute a transaction only upon the request of a customer. This distinction, of course, cuts against the argument that CSC's services are a "public sale." The discretionary authority of the bank in ICI rendered it arguably more like a principal than the mere agent of a customer.
 
 
 24
 The second distinction, which was raised by SIA during oral argument, is that the bank in ICI rendered advice only to its existing customers whereas CSC will provide services for any "Institutional Customer." See supra note 3. SIA argues that this distinction renders CSC's proposed services a "public sale" because it will place CSC in a better position to manipulate the market through the purchase and sale of securities. This conclusion does not follow from its premise. A bank with existing large institutional customers, and with discretionary management authority over the customer's accounts, would seem to be in a better position than CSC to affect the market through the purchase or sale of securities.
 
 
 25
 SIA has not raised a serious challenge to the Board's finding that CSC's proposed activities do not fall within the literal meaning of "public sale" as interpreted by the Court in Schwab. SIA relies primarily on the definition of "sale" in the American Heritage Dictionary (1970 ed.), which includes to "promote," for its argument that the provision of investment advice transforms the brokerage services into a sale. See Reply Brief for Petitioner Securities Industry Association at 1-2 & n. 2. While a dictionary definition may be useful for a number of purposes, it cannot override a more specific meaning given by the statutory context in which a word resides. The Supreme Court in Schwab held that the term "public sale" must be read in conjunction with the underwriting activities surrounding it in the Act and the definition so derived is the one the Board is bound to apply.
 
 III.
 
 26
 SIA's primary challenge to the Board's order is that CSC's proposed activities implicate the "subtle hazards" that led Congress to pass the Act and thus must be deemed to be included in the term "public sale." We find, however, that the legislative history, from which the Supreme Court has gleaned these "subtle hazards," confirms the Board's interpretation of section 20.
 
 
 27
 In Investment Co. Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), the Supreme Court held that the operation by a bank of a mutual fund which was the equivalent of an open-end investment company was prohibited by the language of sections 16 and 21 of the Act. Id. at 625, 639, 91 S.Ct. at 1096, 1103. The Court went on, however, to address the legislative history and the policies underlying the Act and concluded that "[t]he hazards that Congress had in mind were not limited to the obvious danger that a bank might invest its own assets in frozen or otherwise imprudent stock or security investments." Id. at 630, 91 S.Ct. at 1098. The Court found that "Congress also had in mind and repeatedly focused on the more subtle hazards that arise when a commercial bank goes beyond the business of acting as fiduciary or managing agent and enters the investment banking business either directly or by establishing an affiliate to hold and sell particular investments." Id.
 
 
 28
 As later summarized by the Court, the subtle hazards identified in Camp were these:
 
 
 29
 The Court recognized that because the bank and its affiliate would be closely associated in the public mind, public confidence in the bank might be impaired if the affiliate performed poorly. Further, depositors of the bank might lose money on investments purchased in reliance on the relationship between the bank and its affiliate. The pressure on banks to prevent this loss of public confidence could induce the bank to make unsound loans to the affiliate or to companies in whose stock the affiliate has invested. Moreover, the association between the commercial and investment bank could result in the commercial bank's reputation for prudence and restraint being attributed, without justification, to an enterprise selling stocks and securities. Furthermore, promotional considerations might induce banks to make loans to customers to be used for the purchase of stocks and might impair the ability of the commercial banker to render disinterested advice.
 
 
 30
 ICI, 450 U.S. at 66-67 n. 38, 101 S.Ct. at 986-87 n. 38.
 
 
 31
 In Schwab, also decided after Camp, the Court again addressed the legislative history of the Act and concluded "that Congress enacted Sec. 20 to prohibit the affiliation of commercial banks with entities that were engaged principally in 'activities such as underwriting.' " 468 U.S. at 219, 104 S.Ct. at 3010, quoting ICI, 450 U.S. at 64, 101 S.Ct. at 985. The Court reaffirmed the finding in Camp that "[c]ongressional concern over the underwriting activities of bank affiliates included both the fear that bank funds would be lost in speculative investments and the suspicion that the more 'subtle hazards' associated with underwriting would encourage unsound banking practices," 468 U.S. at 220, 104 S.Ct. at 3010, but the opinion limited this finding by concluding that "all" of the "subtle hazards" identified by Congress "are attributable to the promotional pressures that arise from affiliation with entities that purchase and sell investments on their own account." Id. at 220 n. 23, 104 S.Ct. at 3011 n. 23.
 
 
 32
 The Court then held that the provision of discount brokerage services does not implicate any of the "subtle hazards" identified by Congress:
 
 
 33
 Because Schwab trades only as agent, its assets are not subject to the vagaries of the securities markets. Moreover, Schwab's profits depend solely on the volume of shares it trades and not on the purchase or sale of particular securities. Thus, [the bank] has no "salesman's stake" in the securities Schwab trades. It cannot increase Schwab's profitability by having its bank affiliate extend credit to issuers of particular securities, nor by encouraging the bank affiliate improperly to favor particular securities in the management of depositors' assets.
 
 
 34
 468 U.S. at 220-21, 104 S.Ct. at 3010-11.
 
 
 35
 As an initial matter, we do not believe that any discussion of "subtle hazards" is necessary here because it is clear that CSC will not "hold and sell particular investments," see Camp, 401 U.S. at 630, 91 S.Ct. at 1099, or "purchase and sell [securities] on [its] own account," see Schwab, 468 U.S. at 220 n. 23, 104 S.Ct. at 3011 n. 23--the circumstances the Supreme Court has stated give rise to these "subtle hazards."[8] Further, each of the negative findings in Schwab is equally applicable to CSC's proposed services. CSC will not invest its own funds, or those of NatWest, but will act only as agent for the customer. Because CSC will receive a commission only on transactions it executes, regardless of whether CSC advised the customer to purchase the security or whether the customer followed that advice, its profits will depend "solely on the volume of shares it trades and not on the sale of particular securities." Therefore, because CSC has no interest in the sale of a particular security, NatWest has no "salesman's stake" in the particular security and the "subtle hazards" identified in Camp are not implicated.
 
 
 36
 SIA argues that NatWest will have a "salesman's stake" in the securities CSC may advise its customers to purchase because "CSC will actively promote trades in specific securities and will generate profits based upon its success in convincing customers to purchase or sell those particular securities[:] [w]hen CSC recommends and sells a particular security, CSC acquires an interest in the performance of that security and derivatively, in the financial condition of the issuer." Brief for Petitioner Securities Industry Association at 12-13.
 
 
 37
 As an initial matter, we do not understand the reasoning underlying SIA's "subtle hazards" analysis. CSC will not have any financial interest in the sale of a particular security. CSC will have no relationship with any issuer and will receive a commission on any sale or purchase it executes for a customer. If CSC advises a customer to buy Company X's securities but the customer would prefer to buy Company Z's securities, then CSC clearly would not have an incentive to sell Company X's securities. CSC would be indifferent because it would receive its brokerage fee either way. Thus, CSC's financial incentive relates solely to the number of shares it trades and not to any particular security. Further, as noted by NatWest, since CSC will in reality recommend only a small percentage of securities traded, "CSC can hope to operate profitably only if the vast majority of transactions that it brokers involve securities as to which it has made no investment recommendation at all." Brief for Intervenors-Respondents National Westminster Bank PLC and NatWest Holdings, Inc. at 5. Thus, SIA's argument that CSC will have the ability "to influence in which securities the customers will trade, with a prospect of increased income as a result," Reply Brief for Petitioner Securities Industry Association at 6, is incorrect.
 
 
 38
 Although we believe that the decision in Schwab is dispositive with respect to the nonexistence of any "subtle hazards" arising from CSC's proposed services, we also find that SIA has not identified any "subtle hazard" which would require the Board to reject NatWest's application. Most of the alleged hazards raised by SIA have been addressed by the Supreme Court and rejected as not within the category of activity Congress sought to prohibit under the Act in the absence of an interest in a particular security.
 
 
 39
 SIA argues that NatWest might make unsound loans to issuers of securities CSC recommends, that CSC might recommend securities issued by bank customers who have or seek loans from the bank, and that NatWest may lose its reputation for "prudence and restraint" if a depositor follows CSC's advice and the security performs poorly. See Brief for Petitioner Securities Industry Association at 12-13. These same potential hazards might flow from the provision of investment advice, which was nonetheless upheld by the Court in ICI. We cannot determine how the CSC's provision of execution services will add to the potential for these hazards, and thus we remain bound by the Court's analysis in ICI. A contrary holding, that the potential for these hazards is sufficient to render an activity unlawful, would render all investment advisory activities, including those traditionally performed by bank trust departments, unlawful. We agree with the Court's reasoning in ICI, and conclude that Congress could not have intended to render unlawful a significant part of a bank's fiduciary activities through section 20 of the Act. See ICI, 450 U.S. at 63, 101 S.Ct. at 985; see also Investment Co. Inst. v. Conover, 790 F.2d at 931.
 
 
 40
 We also believe that the Board's conclusion that these hazards are not likely to develop given the realities of the brokerage industry and the commitments made by NatWest is entitled to substantial deference. See Bankers Trust II, 807 F.2d at 1067 (Board is not foreclosed from "deciding that the realities of a situation make even the potential for conflict substantially unlikely").
 
 
 41
 The Board found "no significant potential for loss of confidence in an affiliate bank as a result of [the] proposal, given the strict operational separation proposed, ... the fact that the public and bank depositors should understand that CSC would not commit its funds to any specific investments, and that depositor lists would not be transmitted from an affiliated bank to CSC." 72 Fed.Res.Bull. at 595. The Board also noted that the potential for loss of depositor confidence exists whenever a bank gives investment advice. Id. at 589.
 
 
 42
 The Board also found that there was no "significant potential" that CSC would recommend particular securities of customers so that the proceeds could be used to pay existing loans because CSC's advice will most likely relate to securities traded in the secondary market and federal securities laws require disclosure of the intended use of the proceeds from newly issued securities and because NatWest will not disclose information to CSC regarding loans to customers. 72 Fed.Res.Bull. at 590, 595.
 
 
 43
 Finally, the Board did not find that there was any significant possibility that NatWest would extend unsound loans to issuers whose securities CSC had recommended because "the expected benefit of such conduct would likely be outweighed by the potential losses resulting from the bad loans, and ... information relating to the particular recommendations made by CSC would not be provided to NatWest affiliates." 72 Fed.Res.Bull. at 595.
 
 
 44
 SIA does not challenge the substance of these reasoned determinations but instead argues that the Board's analysis is flawed because it cannot rely on any of the commitments made by NatWest in its "subtle hazards" analysis. SIA argues that if the Board recognizes any potential hazard, the activity must be prohibited without regard to any arrangement which would prevent its occurrence. By relying on these commitments, SIA argues, the Board again engaged in the practice rejected by the Supreme Court in Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 468 U.S. 137, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984) ("Bankers Trust I "), of " 'effectively convert[ing] a portion of the Act's broad prohibition into a system of administrative regulation.' " Brief for Petitioner Securities Industry Association at 19, quoting Bankers Trust I, 468 U.S. at 153, 104 S.Ct. at 2988.
 
 
 45
 We recently rejected this flawed interpretation of Bankers Trust I. In Bankers Trust II, we held that although "[t]he Glass-Steagall Act does impose a system of flat 'prohibitions' and 'prophylactic' measures, ... this cannot obviate the need to examine particular factual situations to determine on which side of the prohibitory line they fall." 807 F.2d at 1067. Here, the Board has not attempted to save by continuing regulatory oversight a proposed activity that falls within the literal language of the statute. See Bankers Trust I, 468 U.S. at 153, 104 S.Ct. at 2988. Instead, the Board has reviewed the "realities of a situation," Bankers Trust II, 807 F.2d at 1067, has determined that the activities do not fall within the literal language of the statute, and has "impos[ed] restrictions designed to assure that the activity is insulated from that associated with investment banking." 72 Fed.Res.Bull. at 595 (footnote omitted). This practice has been approved by the Supreme Court, see ICI, 450 U.S. at 66-67, 101 S.Ct. at 986-87 ("none of these 'more subtle hazards' would be present were a bank to act as an investment adviser ... subject to the restrictions imposed by the Board"), and we will not disturb it here.[9]
 
 IV.
 
 46
 Finally, SIA argues that the Board's approval of NatWest's application is inconsistent with its recent decisions in Sovran Financial Corp., 72 Fed.Res.Bull. 146 (1986), and United Jersey Banks, 69 Fed.Res.Bull. 565 (1983), because in each of these decisions the Board approved the provision of brokerage execution services precisely because the broker did not provide investment advice. We do not read these decisions as so holding and, thus, find that they are not inconsistent with the Board's decision in this case.
 
 
 47
 In Sovran Financial Corp., the Board addressed the question of whether a bank subsidiary could provide investment advice about, and underwrite and deal in, government obligations and money market instruments and at the same time provide brokerage services for separate classes of securities. The issue of whether the affiliate could provide investment advice and its brokerage services for the same classes of securities was not before the Board. In rejecting SIA's contention that the subsidiary's activities would violate the Act, the Board stated:
 
 
 48
 SIA's assertions ... are not warranted because they presuppose an integration of securities brokerage with investment advisory and research services--an integration that ... is not involved in Applicant's proposal. As in ... (Schwab ), SIC will not have a "salesman's stake" or other promotional interest in any securities it brokers because it will not purchase or sell any such securities for its own account, and will not provide any investment advice or research in connection with its securities brokerage services.
 
 
 49
 72 Fed.Res.Bull. at 148 (emphasis in original). This is not, as SIA argues, a finding that the provision of brokerage services is permissible only in the absence of investment advice. The Board's statement was merely that SIA's argument was misplaced because the issue was not presented by the facts of the case. The statement is, therefore, not inconsistent with the Board's decision in this case.
 
 
 50
 Similarly, in United Jersey Banks, there is no indication that the applicant proposed to combine brokerage services with investment advice. In approving the application to provide discount brokerage services, the Board noted that because the brokerwould not deal in securities for its own account and would not actively promote any particular security through the provision of investment advice or otherwise, it would not have the "salesman's stake" or promotional interest in the success or failure of any particular issue of securities that led Congress to mandate a separation of banking from certain types of securities-related activities.
 
 
 51
 69 Fed.Res.Bull. at 568. Even if this statement were addressed to an issue that was before the Board, it would not be inconsistent with the Board's decision here. The Board in the statement above did not hold, or imply, that the provision of investment advice would be impermissible when an affiliate does not deal in securities for its own account. Thus, we do not find the Board's decision here to be inconsistent with any of its previous holdings.
 
 
 52
 Because we find that the Board's decision is a reasonable interpretation of the language and legislative history of section 20, we deny the petition for review.
 
 
 53
 It is so ordered.
 
 
 
 *
 Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 291 (a) (1982)
 
 
 [1]
 The Glass-Steagall Act is the popular name for four provisions in the Banking Act of 1933. See 12 U.S.C. Secs. 24 (Seventh), 78, 377, 378 (1982 & Supp. III 1985). The provisions were enacted in the wake of the 1929 stock market crash with the "general purpose of separating as completely as possible commercial from investment banking." Board of Governors of the Fed. Reserve Sys. v. Investment Co. Inst., 450 U.S. 46, 70, 101 S.Ct. 973, 989, 67 L.Ed.2d 36 (1981). Section 16 of the Act prohibits commercial banks from purchasing or selling securities except "upon the order, and for the account of, customers." 12 U.S.C. Sec. 24 (Seventh) (1982 & Supp. III 1985). Section 20 prohibits member bank affiliation with corporations engaged principally in certain securities activities. Id. Sec. 377 (1982). Section 21 bars "any person, firm, corporation, association, business trust, or other similar organization" from engaging in securities activities while engaged in "the business of receiving deposits." Id. Sec. 378 (1982). Finally, Sec. 32 prohibits corporate interlocks between member banks and entities "primarily engaged" in the securities activities listed in Sec. 20. Id. Sec. 78 (1982)
 
 
 [2]
 Section 4(c)(8) is an exception to the general prohibition in the Bank Holding Company Act of acquisition by a bank holding company of ownership or control of a company that is not a bank. See 12 U.S.C. Sec. 1843(a) (1982). Section 4(c)(8) authorizes a bank holding company to acquire "shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto." Id. Sec. 1843(c)(8). In determining whether an activity is a "proper incident," the Board is to "consider whether its performance by an affiliate of a holding company can reasonably be expected to provide benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices." Id
 
 
 [3]
 Specifically, NatWest sought approval for CSC to engage in the following activities:
 (1) provide "portfolio investment advice to Institutional Customers," a term defined to include a bank, insurance company or corporation "with assets exceeding $5,000,000 that regularly invests in the types of securities as to which investment advice is given, or that regularly engages in transactions in securities; ... an employee benefit plan with assets exceeding $5,000,000 ...; and a natural person whose individual net worth ... at the time of receipt of the investment advice or brokerage services exceeds $5,000,000." [Joint Appendix ("J.A.") at 10-11];
 (2) provide "securities brokerage services, related securities credit activities pursuant to the Board's Regulation T, and incidental activities such as offering custodial services and cash management services, in each case for Institutional Customers, and in each case under circumstances where the securities brokerage services are restricted to buying and selling securities solely as agent for the account of such Customers;"
 (3) furnish "general economic information and advice, general economic statistical forecasting services and industry studies to Institutional Customers; and"
 (4) serve "as investment advisor (as defined in Section 2(a)(20) of the Investment Company Act of 1940) to investment companies registered under that Act."
 J.A. at 63.
 
 
 [4]
 While the application was pending, the Board sought and received further commitments from NatWest regarding its relationship with CSC and regarding CSC's proposed activities:
 "1. The Subsidiary will not transmit its investment advisory research or recommendations to the commercial lending department of any member of the NatWest group. (This is not intended, of course, to preclude the publication or dissemination of the Subsidiary's research or recommendations to potential Institutional Customers (as defined in the Application) generally.)" J.A. at 173.
 "2. In any brokerage transaction performed by the Subsidiary where the counterparty (as principal) is a member of the NatWest group, NatWest will disclose this fact to the brokerage customer and obtain specific consent from the customer for such transaction." Id.
 
 
 [3]
 "No director of the Subsidiary will also be a director of either NatWest PLC, National Westminster Bank USA, N.A. ("NatWest USA ") or any subsidiary of NatWest USA. It is anticipated, however, that certain directors of the Subsidiary may also be directors of other subsidiaries of NatWest PLC." J.A. at 175
 
 
 [4]
 "No officer of the Subsidiary will also serve as an officer of either NatWest PLC, NatWest USA or any subsidiary of NatWest USA. In addition, no officer of the Subsidiary engaged in providing investment advisory or securities brokerage services will also provide such services for, on behalf of or with respect to any other member of the NatWest group. As noted in the Application (at 9), the Subsidiary will be maintained, and will hold itself out to the public, as a separate and distinct corporate entity, and will conduct its business separate from the other members of the NatWest group." Id
 
 
 [5]
 "The Subsidiary will not refer its customers who desire to purchase securities on credit to any Affiliate." J.A. at 177
 
 
 [6]
 "There will be no established program by which an Affiliate will extend credit for securities purchases to the Subsidiary's customers." Id
 
 
 [7]
 "As set forth in the Application (at 60), the Subsidiary is seeking approval to engage in securities credit activities pursuant to the Board's Regulation T and, accordingly, is expected to have its own margin account/lending ability, with normal associated powers." Id
 
 
 [5]
 Those non-bank activities found by the Board to be "closely related to banking" and thus permissible activities for bank holding companies are listed in the Board's Regulation Y. 12 C.F.R. Sec. 225 (1986). At the time of NatWest's application, Regulation Y provided that a bank holding company could permissibly act as an investment advisor, as defined in Sec. 20(a)(20) of the Investment Company Act of 1940, 15 U.S.C. Sec. 80a-2(a)(20) (1982), to an investment company registered under that Act. 12 C.F.R. Sec. 225.25(b)(4)(ii) (1986.) This provision was upheld by the Supreme Court in Board of Governors of the Fed. Reserve Sys. v. Investment Co. Inst., 450 U.S. 46, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981) ("ICI "). This provision also permits bank holding companies to provide portfolio investment advice to any other person. 12 C.F.R. Sec. 225.25(b)(4)(iii) (1986). Regulation Y also provided at the time of NatWest's application that bank holding companies could provide securities brokerage services, if the services were "restricted to buying and selling securities solely as agent for the account of customers and do not include securities underwriting or dealing or investment advice or research services." Id. Sec. 225.25(15) (1986). These activities were upheld against Glass-Steagall Act challenges in Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 468 U.S. 207, 104 S.Ct. 3003, 82 L.Ed.2d 158 (1984) ("Schwab ")
 
 
 [6]
 There is no reason to believe that the Court's holding with respect to Sec. 21, which prohibits any entity "engaged in the business of ... selling" securities from receiving deposits, would not be equally applicable to the "public sale" provision in Sec. 20. In fact, the Supreme Court has specifically noted that "a less stringent standard should apply to determine whether a holding company has violated section 20 than is applied to a determination of whether a bank has violated sections 16 and 21." ICI, 450 U.S. at 61 n. 26, 101 S.Ct. at 984 n. 26
 
 
 [7]
 The Court in Schwab expressly declined to address the issue of whether best efforts underwriting by an affiliate would violate the Act. See 468 U.S. at 217-18 n. 17, 104 S.Ct. at 3009 n. 17. We do not decide that issue here
 
 
 [8]
 We also question, as we did recently in Bankers Trust II, whether any "subtle hazards" analysis is required upon a finding that the challenged activities do not fall within the literal terms of the Act. See 807 F.2d at 1066-67
 
 
 [9]
 SIA argues that the "subtle hazards" underlying the Act are implicated because CSC may recommend securities originally underwritten or distributed by County Bank Limited, NatWest's overseas merchant bank affiliate. See Brief for Petitioner Securities Industry Association at 13. NatWest's merchant bank affiliate does not engage in securities activities in the United States but is permitted pursuant to the Board's Regulation K, 12 C.F.R. Sec. 211.5(d)(13) (1986), see 12 U.S.C. Sec. 1843(c)(9), (c)(13) (1982), to engage in securities dealing and underwriting activities overseas. SIA did not raise this issue before the Board as a potential subtle hazard for purposes of the Glass-Steagall Act. The Board did address this issue in its analysis under the Bank Holding Company Act and concluded that any adverse effect from NatWest's merchant banking activities was not likely to occur:
 The Board notes that NatWest engages in extensive merchant banking activities outside of the United States, including acting as a dealer in securities. However, NatWest has committed that the securities operations of its overseas affiliates will be limited to transactions that do not constitute dealing in securities in the United States. Moreover, in any transaction by CSC in which a NatWest affiliate is a counter-party (e.g. where CSC would purchase securities desired by a customer from its affiliate's inventory), NatWest has committed that CSC will disclose that fact to its customer and obtain the customer's specific consent for the transaction.
 
 
 [72]
 Fed.Res.Bull. at 590 & n. 25. We agree with the Board in its brief on appeal that this "potential hazard" has also been precluded as a basis for rejection of NatWest's application by the Court's analysis in ICI; this risk exists whenever a bank holding company with an overseas merchant bank affiliate renders investment advice. Additionally, we do not see how CSC's provision of investment advice and brokerage execution services with respect to the merchant bank's securities could lead to the conclusion that CSC is engaged in the "public sale" of securities in the United States. Petitioner's real challenge is to the Board's determination in Regulation K that banks may be affiliated with an entity that engages in the sale of securities outside the United States; under SIA's theory, NatWest's affiliation with the overseas merchant bank would itself be a violation of Sec. 20. The validity of Regulation K, however, is not an issue that is before us in this case