**SECURITIES INDUSTRY ASSOCIATION,**
Petitioner,

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM,**
et al., Respondents,

Chase Manhattan Corp., Intervenor.

No. 87–1169.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1988.

Decided May 27, 1988.

As Amended May 27, 1988.

James B. Weidner, with whom David A. Schulz and William J. Fitzpatrick, New York City, were on the brief, for petitioner.

Richard M. Ashton, Associate General Counsel, Board of Governors of the Federal Reserve System, with whom Richard K. Willard, Asst. Atty. Gen., Washington,

D.C., at the time the brief was filed, was on the brief, for respondents. James A. Michaels, Counsel, Board of Governors of the Federal Reserve System, Washington, D.C., also entered an appearance for respondents.

Richard C. Tufaro and Robert B. Adams, New York City, were on the brief for intervenor. D. Stephen Mathias, Washington, D.C., also entered an appearance for intervenor.

Before EDWARDS, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The Securities Industry Association petitions for review of an order of the Board of Governors of the Federal Reserve System. In this latest in a series of cases in which commercial banks have sought to participate in various aspects of the securities business, the Board permitted a commercial bank affiliate to engage to a limited extent in underwriting and dealing in commercial paper. As we conclude that the agency reasonably interpreted the governing statute, we deny the petition for review.

## I. BACKGROUND

### A. Regulatory Background

The Banking Act of 1933, commonly known as the Glass–Steagall Act ("Act"), restricts the securities-related business of commercial banks in order to protect depositors. *See* Banking Act of 1933, ch. 89, 48 Stat. 162 (1933). The Act applies both to national banks, organized under 12 U.S.C. § 21 (1982), and to state-chartered banks that are members of the Federal Reserve System ("state member banks"). *See* 12 U.S.C. § 221 (1982). Both are restricted in their direct securities dealings by section 16 of the Act:

The business of dealing in securities and stock by [a national bank] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of,

customers, and in no case for its own account, and [a national bank] shall not underwrite any issue of securities or stock: *Provided,* That [a national bank] may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe.

12 U.S.C. § 24 (Seventh) (1982) (as currently amended). *See also* Act § 5(c), 12 U.S.C. § 335 (1982) (section 16 limitations apply to state member banks).

Section 21 of the Act bars those involved in the securities business from also engaging in banking:

it shall be unlawful—

(1) For any person, firm, ... or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, ... securities, to engage at the same time to any extent whatever in the business of receiving deposits....

12 U.S.C. § 378(a) (1982). It is generally assumed that "§ 16 and § 21 seek to draw the same line[;] ... the underwriting prohibitions described in the two sections are coextensive...." *Securities Industry Ass'n v. Board of Governors,* 468 U.S. 137, 149, 104 S.Ct. 2979, 2985, 82 L.Ed.2d 107 (1984) (*"Bankers Trust I"*); *see also Securities Industry Ass'n v. Board of Governors,* 807 F.2d 1052, 1057 (D.C.Cir.1986) ("section 21 cannot be read to prohibit what section 16 permits"), *cert. denied,* —— U.S. ——, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987) (*"Bankers Trust II"*).

Although commercial banks may deal directly in securities only to the limited extent allowed by section 16, they are permitted to affiliate with other entities that deal in securities to a somewhat greater extent. The governing provision is section 20 of the Act:

no member bank shall be affiliated ... with any corporation, ... or other similar organization *engaged principally* in the issue, flotation, underwriting, public sale, or distribution ... [of] securities....

12 U.S.C. § 377 (1982) (emphasis added). An "affiliate" is defined as a firm that a bank effectively controls, that effectively controls the bank, or that is subject along

with the bank to effective common control. *See* 12 U.S.C. § 221a(b) (1982).

### B. The Issue

At issue in this case is the extent to which a bank affiliate may underwrite and deal in securities.

The Chase Manhattan Corporation ("Chase") seeks permission for its affiliate, Chase Commercial Corporation ("Chase Commercial"), to underwrite and deal in commercial paper, to wit, short-term promissory notes and other negotiable instruments issued by commercial borrowers. Because commercial paper is a "security" under section 20 of the Act, *Bankers Trust I,* 468 U.S. at 150, 104 S.Ct. at 2986, Chase Commercial would be engaging in activities controlled by the section.

Chase has agreed to limit its affiliate's commercial paper dealings to less than five percent of its gross revenue ("revenue limit"). Chase Commercial has also agreed to limit the amount of commercial paper that it underwrites or places in a given year to five percent of the average amount of dealer-placed commercial paper outstanding during the prior year ("market share limit"). Thus, the only question posed is whether these limitations on Chase Commercial's dealings are sufficient to ensure that it is not "principally engaged" in activity proscribed by section 20.

### C. Proceedings Below

In the decision under review, *Chase Manhattan Corp.,* 73 Fed.Res.Bull. 367 (1987), the Board approved Chase's request that its affiliate be permitted to underwrite and deal in commercial paper within the limits recited above. In doing so, the Board relied on and incorporated its ruling in *Bankers Trust New York Corp.,* 73 Fed. Res.Bull. 138 (1987). Thus our analysis will deal with the agency's reasoning in the latter case.

Bankers Trust only sought permission for its affiliate to place commercial paper, that is to say, to solicit buyers on behalf of the issuers of commercial paper. Even though this court had held that placing commercial paper as an agent of the issuer was not subject to the limitations imposed by section 20, *Bankers Trust II,* 807 F.2d at 1058, the Board considered whether distribution and underwriting would also be permissible. It did so because similar applications were pending that clearly would involve section 20 activity.

The Board rejected Bankers Trust's argument that an affiliate is not "engaged principally" in underwriting and dealing in securities unless those activities account for more than fifty percent of its total business, or are at least its single largest activity. The Board interpreted "principally" in section 20 as meaning "substantially," and determined that a company could have more than one activity in which it was engaged principally. This conclusion was premised on the ordinary meaning of "principally," the legislative history and purposes of the Act, and the Supreme Court's interpretation of a related provision of the Act limiting common directorates between banks and companies engaged "primarily" in securities. 73 Fed.Res.Bull. at 140–46.

The Board rejected the opposing interpretation of section 20 proposed by the Securities Industry Association ("SIA"), a trade association representing a major segment of the nation's securities brokerage and investment banking business; namely, that an affiliate is "engaged principally" in section 20 activity whenever such activity is regular and non-incidental. The Board concluded that an activity is "principal" if it is substantial, and that because Bankers Trust had promised to abide by the five percent revenue and market share limits later adopted by Chase, its affiliate's section 20 activity would be insubstantial. *Id.*

The Board noted that even if an affiliate's activity is not prohibited by the Act, it may still be impermissible under the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1841 *et seq.* (1982). In pertinent part, the BHCA prohibits a bank holding company from owning or controlling voting shares of any company that is not a bank, 12 U.S.C. § 1843(a)(1) (1982), unless the Board determines that the company's activities are "so closely related to banking ... as to be a proper incident thereto." *Id.* at

§ 1843(c)(8). In making its determination, the Board first considers whether the activity, generally considered, is closely related to banking. It then asks whether, in the particular case, the activity may reasonably be expected to produce public benefits (e.g., convenience, competition, efficiency) that outweigh possible adverse effects (e.g., undue concentration of resources, decreased or unfair competition, conflicts of interests, unsound banking practices). *See id.*

The Board applied this method to Bankers Trust's application and concluded that the proposed placement of commercial paper by Bankers Trust's affiliate was permissible under the BHCA, as it was closely related to banking and a proper incident to banking. 73 Fed.Res.Bull. at 146–53. SIA appealed to this court, but the case (docket No. 87–1035) was dismissed pursuant to stipulation.

Meanwhile, Chase applied for permission for its affiliate, Chase Commercial, to deal in commercial paper under conditions similar to those approved by the Board in connection with Bankers Trust's application. Unlike Bankers Trust's affiliate, however, Chase Commercial proposed to purchase commercial paper from the issuer for resale (i.e., underwrite), and to buy and sell commercial paper in the secondary market (i.e., deal). Chase Commercial promised to abide by the same revenue and market share limits approved in the Bankers Trust application. Chase further agreed to restrict its loans to companies whose commercial paper Chase Commercial was underwriting, and accepted certain restrictions on the disclosure of information. 73 Fed.Res.Bull. at 371–72.

The Board approved the application, relying on its *Bankers Trust* decision. It concluded that Chase Commercial's section 20 activity would not be substantial in view of the revenue and market share limitations, and further concluded that the proposal was consistent with the BHCA. SIA now asks us to review *only* the Board's decision on the section 20 issue, not the Board's conclusions under the BHCA.

While this case was *sub judice*, the Second Circuit decided *Securities Industry*

*Ass'n v. Board of Governors of the Federal Reserve System,* 839 F.2d 47 (2d Cir. 1988) (*"Bankers Trust III"*). There, the Board had approved the applications of bank holding companies to underwrite and deal in various securities, including commercial paper, through their affiliates. 73 Fed.Res.Bull. 473 (1987). These affiliates were already underwriting and dealing in government securities, activities that commercial banks are permitted to engage in directly under section 16 of the Act, 12 U.S.C. § 24 (Seventh) (1982).

*Bankers Trust III* upheld the Board's decision not to aggregate these bank-eligible securities with bank-ineligible securities to determine whether the affiliate is "engaged principally" in securities activities proscribed by section 20. 839 F.2d at 62. The Second Circuit further upheld the Board's conclusion that the affiliates could underwrite and deal in bank-ineligible securities subject to the five percent revenue limit. *Id.* at 67. The court agreed with the Board that the banks wrongly interpreted "principally" to mean "chiefly," as opposed to "substantially." *Id.* at 63–64. The court also rejected SIA's claim that section 20 prohibits any "regular" or "integral" activity. *Id.* at 66. On the other hand, *Bankers Trust III* granted the banks' cross-petition for review of the market share limit, holding that it was unsupported by the language, legislative history, and purposes of the Act. *Id.* at 67–68.

## II. DISCUSSION

█ Under the familiar principles enunciated by *Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), we first ask "whether Congress has directly spoken to the precise question at issue." We independently examine the language and, if necessary, the legislative history to determine whether the intent of Congress is clear. If congressional intent is unclear, we then inquire whether the agency's interpretation is "permissible," *id.* at 843, 104 S.Ct. at 2782, i.e., "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union, Local 23,*

—— U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed. 2d 429 (1987).

SIA concedes that the meaning of the crucial phrase of section 20 ("engaged principally") "cannot be derived from the face of the statute...." Reply Brief at 3. Petitioner nevertheless maintains that the legislative history indicates that Congress intended to prohibit precisely the activity the Board approved. We think the legislative history more ambiguous. *Cf. infra* at 896. Nothing we have discovered suggests that Congress "has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781.

We analyze the Board's decision under the second part of the *Chevron* test, *viz.,* was it rational and consistent with the Act? SIA does not contend that the Board's decision was irrational in the sense that it failed altogether to explain its conclusion that the approval would serve the objectives of the Act. *See Chevron,* 467 U.S. at 863, 104 S.Ct. at 2791. It claims, rather, that the Board's order is inconsistent with the Act.

Our review under *Chevron*'s second step is quite deferential. "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer," *id.* at 844, 104 S.Ct. at 2782, at least when, as here, "the Board has comprehensively addressed the language, history, and purposes of the Act...." *Bankers Trust II,* 807 F.2d at 1056.

■ We conclude that the Board's interpretation of section 20 is reasonable. The language and structure of the Act strongly support the Board's view, and neither the legislative history nor the broad purposes of the Act compel the conclusion that the order was based on an impermissible construction of the statute.

A. Language and Structure of the Act

Section 20 of the Act prohibits banks from affiliating with companies "engaged principally" in specified securities dealings. To discern the meaning of these words, one must compare section 20 with sections 16 and 21, which prohibit a bank from *directly* engaging in similar securities dealings. The plain import of these provisions is to allow a bank affiliate to engage to a limited extent in the activities specified, provided those activities are not the "principal" activities of the affiliate.

SIA argues that the Act was designed to abolish securities affiliates of banks. Brief for Petitioner at 9. Apparently recognizing that section 20 by its terms refutes this characterization, SIA advances an alternative interpretation:

> The one way to square the language of Section 20 with Congress' prohibitive intent is to read the section as barring underwriting or dealing activities that amount to a regular or integral part of an affiliate's business, as opposed to incidental or sporadic activities.

*Id.* at 11. *See also* Reply Brief at 8 (defining "principally" with reference to frequency as well as quantity).

The Board rejected SIA's interpretation. It referred to standard dictionary definitions of "principal" as meaning "primary," "substantial," "main," "leading," "important," or "outstanding." 73 Fed.Res.Bull. at 141–42. "Principal" is susceptible of a variety of interpretations. As *Chevron* requires that we defer to the agency's reasonable construction, we cannot say that the Board's interpretation was impermissible. *Accord Bankers Trust III,* 839 F.2d at 64.

All of the terms the Board relied upon define the principal activity according to its relative importance to other activities. A firm could be involved regularly in a variety of activities that would not be principal in this sense, as they would be insignificant vis-a-vis the firm's other activities. Of course, the relative significance of the firm's activities could be measured in various ways—dollar volume, number of transactions, strategic significance, and so on.

SIA seems to argue for a number-of-transactions test, but with a low threshold of significance. Even under this standard, we are at a loss to understand why a firm that each year engaged in one commercial paper transaction, while participating in

millions of non-securities-related activities, would be "engaged principally" in section 20 activity. Regularity and continuity are relevant only if they add up to a total of some significance under the relevant measure. *Cf. Bankers Trust III*, 839 F.2d at 66.

The Board, however, adopted a dollar volume test for "engaged principally," looking to the volume from the perspective of both the affiliate (revenue limit) and the market (market share limit). Again, we cannot say the Board acted unreasonably. As Chase has not cross-petitioned for review of the market share limit, we have no occasion to consider *Bankers Trust III*'s holding that the limit is unreasonable. Even assuming the market share limit is invalid, we agree with the Second Circuit that the Board's approval of the revenue limit is "both reasonable and consistent with" section 20. *Bankers Trust III*, 839 F.2d at 67.

The reasonableness of the Board's interpretation of section 20 is underlined by *Board of Governors v. Agnew*, 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408 (1947). *Agnew* concerned section 32 of the Act, which prohibits directors, officers, or employees of banks from simultaneously holding similar positions at firms *"primarily* engaged in the issue, flotation, underwriting, public sale, or distribution ... [of] securities...." 12 U.S.C. § 78 (1982) (emphasis added). The bank directors were also employees of one of the nation's leading underwriters, Eastman, Dillon & Co., which earned between twenty-six and forty percent of its revenues by underwriting securities while generating a slightly greater percentage of its revenues from brokerage.

The Board had held that section 32 applied because Eastman, Dillon was "primarily engaged" in securities underwriting. The Court of Appeals reversed the Board, holding that "primarily engaged" meant "chiefly" or "principally" engaged, i.e., that underwriting must exceed fifty percent of the firm's business. The Supreme Court reinstated the Board's decision:

> An activity or function may be "primary" in that sense if it is substantial. If the underwriting business of a firm is substantial, the firm is engaged in the underwriting business in a primary way, though by any quantitative test underwriting may not be its chief or principal activity.

329 U.S. at 446, 67 S.Ct. at 414. The Court had little difficulty concluding that Eastman, Dillon was engaged primarily both in underwriting and in brokerage, given the proportion of its revenue derived from these sources. *Id.* The Court buttressed its conclusion by considering the structure of the statute:

> Section 20 of the Act outlaws affiliation of a member bank with an organization "engaged principally" in the underwriting business.... On the other hand, when Congress came to deal with the practice of underwriters taking checking deposits, it used language different from what it used either in §§ 19 and 20 on the one hand or in § 32 on the other. By § 21 it prohibited any organization "engaged" in the underwriting business "to engage at the same time to any extent whatever" in the business of receiving checking deposits. Thus within the same Act we find Congress dealing with several types of underwriting firms—those "engaged" in underwriting, those "primarily engaged" in underwriting, those "engaged principally" in underwriting. The inference seems reasonable to us that Congress by the words it chose marked a distinction which we should not obliterate by reading "primarily" to read "principally."

*Id.* at 447–48, 67 S.Ct. at 414–15 (footnote omitted).

The continuum from "engaged principally" (permitting most latitude) through "engaged principally" (permitting some latitude) to "engaged" (permitting no latitude) indicates that the Board's current interpretation of "principally" as "substantially" is not too expansive. We need not decide whether principally means more than primarily (or substantially), *cf. Bankers Trust III*, 839 F.2d 67–68, for *Agnew* clearly indicates that principal is not *more* restrictive than substantial.

More recent cases also support the Board. In *Board of Governors v. Investment Company Institute*, 450 U.S. 46, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981) (*"ICI"*), the Supreme Court upheld the Board's determination that bank holding companies could act as investment advisers to closed-end investment companies under the Act and the BHCA. In rejecting respondent's argument that sections 16 and 21 of the Act applied to bank holding companies as well as banks, the Court discussed the structure of the Act:

> Sections 16 and 21 flatly prohibit banks from engaging in the underwriting business. Organizations affiliated with banks, however, are dealt with by other sections of the Act. Section 19(e), 48 Stat. 188, repealed in pertinent part, 80 Stat. 242, prohibited bank holding companies from voting the shares of a bank subsidiary unless the holding company divested itself of any interest in a subsidiary formed for the purpose of or "engaged principally" in the issuance or underwriting of securities. More importantly, § 20 of the Act, 48 Stat. 188, prohibits national banks or state bank members of the Federal Reserve System from owning securities affiliates, defined in § 2(b), 48 Stat. 162, that are "engaged principally" in the issuance or underwriting of securities. Thus the structure of the Act reveals a congressional intent to treat banks separately from their affiliates. The reading of the Act urged by respondent would render § 20 meaningless.

450 U.S. at 59 n. 24, 101 S.Ct. at 983 n. 24. The Court re-emphasized the Act's different treatment of banks and bank affiliates later in the opinion. Citing *Agnew*, the Court wrote: "a less stringent standard should apply to determine whether a holding company [or affiliate] has violated § 20 than is applied to a determination of whether a bank has violated §§ 16 and 21." *Id.* at 61 n. 26, 101 S.Ct. at 984 n. 26. Similarly:

> the words "principally engaged," contained in both §§ 19(e) and 20 of the Glass–Steagall Act, the sections applicable to bank affiliates, indicate a significantly less stringent test for determining the permissibility of securities-related activity than does the word "engaged," contained in §§ 16 and 21, the sections applicable to banks.

*Id.* at 71 n. 46, 101 S.Ct. at 989 n. 46. *See also Investment Co. Inst. v. FDIC*, 815 F.2d 1540, 1547 (D.C.Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987).

### B. Legislative History

Given the manifest reasonableness of the Board's interpretation of the Act's language and structure, petitioner would have to point to exceptionally clear indications in the legislative history of a contrary congressional intent to convince us that the Board's interpretation was impermissible. This it has failed to do.

SIA points to isolated statements suggesting that Senator Bulkley intended to eliminate affiliates altogether. Brief for Petitioner at 9–10 (quoting 75 Cong.Rec. 9909, 9911, 9913 (1932)). *See also* 76 Cong. Rec. 2000 (1933) (Sen. Glass). Despite the apparent desires of Senators Glass and Bulkley, however, Congress did not agree to a total ban on affiliation with entities engaged in securities-related activities. As the Supreme Court has recognized, the Glass–Steagall Act treats banks separately from their affiliates and permits the latter but not the former to engage in securities activities to a limited extent. *See ICI*, 450 U.S. at 59 n. 24, 101 S.Ct. at 982 n. 24. The Act reflects a compromise between various proposals, and it clearly permits affiliation with an entity not engaged principally in section 20 activity. *See supra* at 894–96; *Bankers Trust III*, 839 F.2d at 57–58; *see generally* Macey, *Special Interest Groups Legislation and the Judicial Function: The Dilemma of Glass–Steagall*, 33 Emory L.J. 1 (1984) (arguing that Act was product of compromise between interests of investment banks and commercial banks).

### C. "Purposes" of the Act

SIA argues that the Board's decision contravenes the *general* purpose of the Act:

"to 'separat[e] as completely as possible commercial from investment banking.'" Brief for Petitioner at 8 (quoting *Bankers Trust I,* 468 U.S. at 147, 104 S.Ct. at 2985). SIA's invocation of the Act's general purpose is nothing more than an invitation to substitute our judgment for that of Congress and the agency as to how best to accomplish this purpose.

Congress could not have intended a total isolation of banks from firms engaged in securities dealings. Otherwise, it would not have explicitly permitted bank affiliates to be engaged in such activity, albeit less than "principally." This clear language must prevail over the "general purposes" of the Act:

> The "plain purpose" of legislation ... is determined in the first instance with reference to the plain language of the statute itself. Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action.

*Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986) (citation omitted) (interpreting BHCA). *See also Continental Air Lines, Inc. v. DOT,* 843 F.2d 1444, 1451 (D.C.Cir.1988) ("It is, rather, for the agency to decide the exact trade-off among conflicting goals that 'best promotes' the Congressional 'goal' in question."); *ICI v. FDIC,* 815 F.2d at 1549.

SIA also advances the related argument that the Board's decision implicates the "subtle hazards" that the Act was designed to prevent. *Investment Co. Inst. v. Camp,* 401 U.S. 617, 630, 91 S.Ct. 1091, 1098, 28 L.Ed.2d 367 (1971). These hazards have been summarized as follows:

> The Court [in *Camp* ] recognized that [1] because the bank and its affiliate would be closely associated in the public mind, public confidence in the bank might be impaired if the affiliate performed poorly. [2] Further, depositors of the bank might lose money on investments purchased in reliance on the relationship between the bank and its affil-

iate. [3] The pressure on banks to prevent this loss of public confidence could induce the bank to make unsound loans to the affiliate or to companies in whose stock the affiliate has invested. [4] Moreover, the association between the commercial and investment bank could result in the commercial bank's reputation for prudence and restraint being attributed, without justification, to an enterprise selling stocks and securities. [5] Furthermore, promotional considerations might induce banks to make loans to customers to be used for the purchase of stocks and might impair the ability of the commercial banker to render disinterested advice.

*ICI,* 450 U.S. at 66–67 n. 38, 101 S.Ct. at 986–87 n. 38.

Although the Court has repeatedly looked to the subtle hazards in interpreting the Act, such references cannot override the clear language of the statute. *Cf. Dimension Financial,* 474 U.S. at 373–74, 106 S.Ct. at 688–89. We are especially wary of giving excessive weight to the subtle hazards when interpreting section 20. "By using in § 20 the language 'engaged principally' rather than a more restrictive term, Congress expressed a legislative choice to tolerate at least some of those hazards." *Bankers Trust III,* 839 F.2d at 61.

In *Bankers Trust II,* we concluded that the Board had reasonably interpreted ambiguous language in the Act, but recognized that the Board's approval of private placement of commercial paper would implicate the first subtle hazard (public confidence in the bank). We nevertheless affirmed:

> First, the "subtle hazards" addressed in *Camp* and returned to in *ICI* [, 450 U.S. at 66–67, 101 S.Ct. at 986–987], *Schwab* [*Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys.,* 468 U.S. 207, 220–21, 104 S.Ct. 3003, 3010–11, 82 L.Ed.2d 158 (1984) ], and *SIA* [, i.e., *Bankers Trust I,* 468 U.S. at 155–56, 104 S.Ct. at 2988–89,] have never alone caused the Supreme Court to hold that Glass–Steagall permits or prohibits any

particular banking practice. Rather, analysis of the hazards in those cases simply reinforced the Court's conclusion that, as a matter of statutory interpretation, Glass–Steagall permitted or prohibited the questioned practice. Moreover, the Court has concluded that "subtle hazards" counsel prohibition of a banking practice only when the practice gives rise to each and every one of the hazards. *See SIA*, 468 U.S. at 154–59, [104 S.Ct. at 2988–91]. *Camp*, 401 U.S. at 630–34, 636–38 [91 S.Ct. at 1098–1100, 1101–02]. Nor must a hazard be "totally obliterated" to permit a banking practice—avoidance of the hazard "to a large extent" suffices. *See ICI*, 450 U.S. at 67 n. 39 [101 S.Ct. at 987 n. 39]. Finally, our conclusion is reinforced by our view that the "subtle hazards" analysis as a whole is a specific instance of the *Chevron* principle that requires our deference to an agency's reasonable construction of its statute's ambiguities, since an agency's statutory interpretation that impairs one of the statute's purposes but not others may surely nonetheless be reasonable. (Indeed, the binding force of the Supreme Court's "subtle hazards" analysis in *SIA* is unclear, since, as we have already noted, the Board failed to offer the Court any rationale concerning those hazards to which the Court could defer).

807 F.2d at 1069 (citations omitted).

We will not reverse the Board under the subtle hazards analysis in this case for substantially the same reasons we gave in *Bankers Trust II.* Indeed, the reasons for doing so in this case are even more persuasive because we deal with a statute that more clearly permits the activity that the Board approved.

The Board admitted that under its reading of section 20, "the potential for 'subtle hazards' may continue to exist, albeit at a minimized level." 73 Fed.Res.Bull. at 144. This minimal risk, however, did not alter the clear Congressional decision to allow some limited level of underwriting by member bank affiliates. As the Supreme Court recognized in *Agnew*, even though the potential for conflicts and other hazards may exist whatever proportion of the firm's business derives from underwriting, the Glass–Steagall Act does not by its terms establish a complete barrier between banks and underwriting firms. 329 U.S. at 447 [67 S.Ct. at 414].

*Id.* 468 U.S. at 144–45, 104 S.Ct. at 2983–84. The Board further determined that the limitations imposed in the order would minimize the hazards to insignificance. *Id.* at 145, 104 S.Ct. at 2983. We agree with this analysis.

Of the specific hazards identified in *Camp*, only the first, second, and fourth are implicated. The first hazard is that public confidence in the bank would be eroded if the affiliate performed poorly. This does not seem to be a serious risk because commercial paper would constitute a small proportion of the affiliate's business. The second hazard is that depositors of the bank might lose money on investments purchased in reliance on the bank's relationship to the affiliate. The fourth hazard is that the bank's reputation for prudence might be attributed to the affiliate.

Although these hazards seem exaggerated, given the sophistication of the purchasers and the high grade of the paper, the Supreme Court declined to dismiss them in *Bankers Trust I*, which held that commercial paper was a security covered by section 20. 468 U.S. at 156–57, 104 S.Ct. at 2989–90. The same hazards were implicated to a slightly lesser extent in *Bankers Trust II*, but we nevertheless upheld the Board's order permitting the placement (not underwriting) of commercial paper. As in that case, the Board's decision here implicates only certain of the hazards, and only to a small extent. The Board reasonably concluded that these limited risks did not override the clear language of the statute.

It should also be noted that the affiliate is subject to Board regulation under the BHCA. *See supra* at 892. Although such regulation cannot supplant the Act's preventative approach, *Bankers Trust I*, 468 U.S. at 147, 104 S.Ct. at 2984, it is one

of the many facts to be taken into account in evaluating the subtle hazards. *See Bankers Trust II,* 807 F.2d at 1067; *see also infra.*

The more serious hazards are the third and fifth, concerning the conflicts arising from the bank's dual role as investor and lender. These are avoided by the order's limitations on loans and investment advice to issuers whose paper the affiliate is underwriting.

### D. Limitations Do Not Prove a Violation of the Act

SIA argues that the limitations imposed in the Board's order (e.g., with respect to lending) prove that the potential for conflicts of interest was latent in the proposed arrangement. SIA asserts that any potential conflict requires the Board to deny the application under section 20 because the purpose of the Act was to prevent such potential conflicts by prohibition, not by regulation. Brief for Petitioner at 14–17 (citing *Bankers Trust I,* 468 U.S. at 147, 104 S.Ct. at 2984).

We have rejected that argument. In *Bankers Trust II,* we indicated that the Act's reliance on prophylaxis "cannot obviate the need to examine particular factual situations.... [T]he Board [is not foreclosed] from deciding that the realities of a situation make even the potential for conflict substantially unlikely." 807 F.2d at 1067. *See also ICI,* 450 U.S. at 66–67, 101 S.Ct. at 986–87 (subtle hazards not present when bank acts as investment adviser "subject to the restrictions imposed by the Board"); *Bankers Trust III,* 839 F.2d at 66 ("The mere necessity of 'regulation' in carrying out Glass–Steagall's 'prohibitions' is insufficient to justify rejection of an otherwise reasonable interpretation of the Act."); *Securities Indus. Ass'n v. Board of Governors,* 821 F.2d 810, 818 (D.C.Cir.1987) (upholding Board's conclusion that "hazards not likely to develop given the realities of the brokerage industry and the commitments made" by the applicant), *cert. denied,* —— U.S. ——, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988).

### III. CONCLUSION

The statute permits banks to affiliate with firms that are not "principally" engaged in section 20 activity; the Board reasonably concluded that "principally" does not include a firm whose commercial paper transactions are subject to the limits included in its order. The petition for review is

*Denied.*